**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DUSTIN S. KOLODZIEJ,**

        **Plaintiff,**

**v.**                                **Case No:  6:11-cv-859-Orl-36GJK**

**JAMES CHENEY MASON and J.**
**CHENEY MASON, P.A.,**

        **Defendants.**

_____

## <u>ORDER</u>

    This cause comes before the Court on the Motion for Summary Judgment (the "Motion") filed by Defendants James Cheney Mason ("Mason") and J. Cheney Mason, P.A. ("Mason Law Firm") (collectively, "Defendants").  (Dkt. 72.)  Plaintiff Dustin S. Kolodziej ("Kolodziej" or "Plaintiff") filed a Response to the Motion ("Response") (Dkt. 79) and Defendants filed a Reply to Plaintiff's Response ("Reply") (Dkt. 85).  Oral argument on the motion was held on September 24, 2013. Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, stipulation of facts, memoranda of counsel and accompanying exhibits, and the oral argument of counsel, and for the reasons that follow, Defendants' Motion will be granted.

**I.**      **BACKGROUND**

    **A.**      **Undisputed Facts[1]**

    The central issue before this Court is whether a unilateral contract was formed between Defendants and Plaintiff Kolodziej.  This purported contract arose as a result of a capital murder

---

[1] The Court has determined the facts based on the parties' submissions, including deposition testimony, affidavits, stipulation of facts, and the exhibits filed with the court.

trial that took place in Bartow, Florida.  (Dkt. 89, Joint Final Pretrial Statement ("JFPS") ¶ 9A; Dkt. 79-3, Deposition of James Cheney Mason ("Mason Dep.") 10:23-11:11.)  Mason, whose law firm is J. Cheney Mason, P.A., was one of the attorneys who represented the criminal defendant, Nelson Serrano ("Mr. Serrano"), in that trial.  *Id.*; Dkt. 72, Ex. 1, Declaration of J. Cheney Mason ("Mason Aff.") ¶¶ 2-3.  Mr. Serrano was accused of murdering four people in central Florida about 60 miles away from Orlando on December 3, 1997.  (JFPS ¶ 9B.)  The trial attracted heavy media interest and, as a consequence, during the trial, NBC News conducted an interview with Mason regarding the case.  (Mason Dep. 21:23-22:2, 22:13-23:2, 33:12-34:2; Mason Aff. ¶ 5; Dkt. 72, Ex. 2, Declaration of William V. Knight, III ("Knight Aff.") ¶ 3; JFPS ¶ 9I.)  During that interview, Mason talked about certain aspects of the prosecution's theory that seemed highly implausible to him.  (Dkt. 76, Stipulation, Jt. Ex. 3, NBC News Mason Interview DVD ("Unedited Mason Interview").)

On the day of the murders, Mr. Serrano could be seen on a security camera at a La Quinta hotel in Atlanta, Georgia several hours before and after the murders had taken place.  (JFPS ¶ 9C.)  At his trial, Mr. Serrano alleged that he could not have committed the murders in Florida between the times that he was seen on the La Quinta hotel security camera in Atlanta.  *Id.* ¶ 9D.  The prosecution's theory of the case was that:  1) on the morning of December 3, 1997, Mr. Serrano slipped out of the Atlanta hotel after having been recorded on the security camera there; 2) he flew by airplane under an assumed name ("Juan Agacio") from Atlanta to Orlando; 3) he drove from the Orlando International Airport ("Orlando Airport") to Bartow where he committed the murders; 4) he subsequently drove from Bartow to the airport in Tampa, Florida; 5) he flew from Tampa back to Atlanta on Delta flight number 1272 under another assumed name ("John White") in a coach seat in Row 30 or 32; and 6) from the Atlanta Hartsfield International Airport ("Atlanta

Hartsfield Airport") where his plane landed, returned to his La Quinta hotel that evening where he once again could be seen on the hotel video camera recording.  (Mason Aff. ¶ 3; JFPS ¶¶ 9C, E; Mason Dep. 37:11-24; Unedited Mason Interview.)

The purported unilateral contract was based on Mason's comments during the NBC interview regarding the last part of the prosecution's theory concerning Mr. Serrano's purported travel from the Atlanta Airport back to his La Quinta hotel.  *See* Unedited Mason Interview.  The prosecution's theory regarding this last leg of the Serrano trip was that Mr. Serrano was able to travel from the time that his Delta plane landed at the Atlanta Airport (referred to by Defendants as "wheels down") to his La Quinta hotel lobby in only 28 minutes.  (Mason Aff. ¶¶ 3-4; Mot. Hr'g Tr. 9, Sept. 24, 2013; Unedited Mason Interview.)  Mason commented during his interview that it was "not possible" for someone to accomplish this trip in the allotted 28 minutes.  *See* Unedited Mason Interview.  Just prior to Mason's comments regarding this last leg of the trip, Mason talked about how he believed it was "highly improbable" for Mr. Serrano to have traveled from the Orlando Airport to the crime scene in Bartow and commit all of the murders within one hour and thirty minutes as the prosecution theorized.  *Id.*  Mason, in general, expressed his disbelief that anyone could have committed these murders between the two times Serrano was seen on the La Quinta hotel video camera.  *Id.*  It was against this backdrop that Mason commented on the last leg of the Serrano trip, as follows:[2]

---

[2] For convenience, the contents of the Unedited Mason Interview included in this opinion have been taken from the transcript of the interview, which the Court notes does not necessarily reflect the true punctuation of Mason's words.  *See* Knight Aff. at 3-6 ("Unedited Interview Transcript"). The Court includes this reproduction of the Unedited Interview Transcript solely as a reference to the actual words that were used by Mason (as well as by the interviewer and by the other attorney present), but will refer to the video recording of the interview when analyzing the conduct of the interview participants as well as the inflection of their words.  *See* Unedited Mason Interview.

CHENEY MASON, ESQ.:
. . . And, of course, just as importantly is-- is the business of getting back to Atlanta, and getting from-- landing in Atlanta and getting to the-- to [the] hotel in 28 minutes.

DENNIS MURPHY[3]:
Airport hotel.

CHENEY MASON, ESQ.:
Well, no, it's not at the airport.  It's five miles away.  You-- how many times [have] you gone through the airport in Atlanta?

DENNIS MURPHY:
More than I'd like to think.

CHENEY MASON, ESQ:
I mean you know you're going to die there.  You're going to be born again and die at the Atlanta Airport.  You have to go through Atlanta to go anywhere, right?

DENNIS MURPHY:
What's the old joke about going to Heaven.

CHENEY MASON, ESQ:
Yeah.  You go through-- through Hartsfield International.

DENNIS MURPHY:
Change at Hartsfield first.

CHENEY MASON, ESQ:
Right.  And-- and so we know that when you land and-- and-- in Atlanta, depending on which concourse you're landing in, you're going to have to wait to get off the airplane.  Even if you're [in] first class.  They usually put the thing behind you so you got to wait till half the plane gets off anyway.  You got people boxed in-- the lady with the kids in the carriage.  Or people getting down their bags.  Or the fat one can't get down the aisle.

I mean, whatever the story is, you've got delays in getting off the airplane.  So if you've got a landing time, you don't get off the airplane at that time.  When-- when have you ever gotten off an airplane in Atlanta in less than 10 minutes.  It's not going to happen.  Then what?  Then you have to go from whatever gate you are,

---

[3] Dennis Murphy conducted the interview with Mason at NBC News.  *See* Unedited Mason Interview.

down to the middle, to go down the el-- the escalators, to catch the subway train to the terminal.

Wait for that.  Wait while it stops in the meantime.  People getting on and off.  Get to that.  Go up again, the escalators.  Get to where you're in the terminal, out the terminal to ground transportation.  And from there to be on the videotape in 28 minutes.  Not possible.  Not possible.  I challenge anybody to show me, and guess what?  Did they bring in any evidence to say that somebody made that route, did so?  State's burden of proof.  If they can do it, I'll challenge 'em.  I'll pay them a million dollars if they can do it.

DENNIS MURPHY:
If they can do it in the timeline (or time allotted).

CHENEY MASON, ESQ:
Twenty-eight minutes.

. . .

Can't happen.  Didn't happen.  So what's the explanation.  Somebody else.  Does that mean necessarily that Mr. Serrano had nothing to do with any of it?  Giving again the argument in the best light of the State and the Jury's suspicion.  Not necessarily.  But did they prove the case they charged-- they proved beyond a reasonable doubt.  Absolutely not.  Couldn't have happened in that way.

BOB NORGARD, ESQ[4]:
All the cameras guys were leaving to go to Hartsfield to try to get to the (UNINTEL) (CHUCKLES)

CHENEY MASON, ESQ:
Call me when you're ready for your check.

*See* Unedited Dateline Transcript.

In October 2006, Mr. Serrano was convicted of the murders and sentenced to death.  (JFPS ¶ 9G; Mason Dep. 11:12-16.)  Mason's interview with NBC was not broadcast during the trial.  (Mason Dep. 21:10-13.)  After the trial, however, NBC News featured the Serrano case in a broadcast of its "Dateline" news program ("Dateline Broadcast").  *Id.*  The Dateline Broadcast

---

[4] Bob Norgard is another attorney who was involved in the Serrano case and was present during Mason's interview with NBC.  *See* Unedited Mason Interview.

included an edited version of Mason's interview in the program. The unedited interview did not air at all.  (Mason Aff. ¶ 6; Dkt. 76, Stipulation, Jt. Ex. 2, Dateline NBC News Mason Interview DVD ("Edited Mason Interview").)   Neither Mason nor the Mason Law Firm were involved in any of the editing or broadcast decisions concerning the Dateline Broadcast.  (JFPS ¶ 9M; Mason Aff. ¶ 6; Mason Dep. 31:14-32:1.)  Mason did not see the program when it aired, nor was he aware that NBC had edited his interview until Kolodziej contacted him to demand payment of one million dollars for purportedly performing Mason's "challenge" as presented in the Dateline Broadcast. (Mason Aff. ¶ 6.)  After editing, the portion of the interview concerning the last leg of the Serrano trip became:[5]

> MURPHY: (Voiceover) And the last part of the time line, the defense argued, was even more implausible.  In less than half an hour, Serrano would have had to get off a wide-bodied jet, exit Atlanta airport, one of the busiest in the world and arrive back at his hotel five miles away, all in time to be photographed looking up at the surveillance camera.
>
> ([footage of] [a]irplane; inside airplane; airplane; highway; surveillance videotape of Serrano at hotel)
>
> Mr. MASON: I challenge anybody to show me—I'll pay them a million dollars if they can do it.
>
> MURPHY: If they can do that in the time allotted.
>
> Mr. MASON: Twenty-eight minutes, can't happen.  Didn't happen.

*See* Edited Dateline Transcript at 14-15.

---

[5] As noted above, for convenience, the contents of the Edited Mason Interview included in this opinion have been taken from the transcript of the edited version of Mason's interview.  (Dkt. 72, Ex. 4 ("Edited Dateline Transcript").)   Again, the Court will refer to the video recording of Mason's edited interview when analyzing the conduct of the interview participants as well as the inflection of their words. *See* Edited Mason Interview.

Meanwhile, in 2007, while a student at the South Texas College of Law, Kolodziej followed the Serrano trial on television.  (Dkt. 79, Ex. A, Oral Deposition of Dustin Kolodziej ("Kolodziej Dep.") 8:1-3; 14:16-25; Dkt. 79-2, Declaration of Kolodziej ("Kolodziej Aff.") ¶ 2.)  At some point, while he was following the trial, Kolodziej saw the Dateline Broadcast, including the Edited Mason Interview concerning the last leg of the Serrano trip.  (Kolodziej Dep. 23:22-25, 25:9-12; Kolodziej ¶ 2.)  Kolodziej heard the broadcast but was unable to focus on viewing it in its entirety at the time as he was also working out.  *Id.* 26:14-18.  However, he later ordered and studied the transcript of this Edited Mason Interview and interpreted it as a serious challenge from the Defendants to "make it off the plane and back to the hotel within 28 minutes" for one million dollars, an offer that he feels he accepted when he purportedly performed the challenge.  *See* Edited Dateline Transcript; Kolodziej Dep. 25:9-15, 31:25-32:3, 32:4-8, 36:4-7; Kolodziej ¶ 2; Tr. 22-23, 28, 34.

The way Kolodziej understood it, in order to accept this "challenge," he believed he would have to prove that the prosecution's theory of the Serrano case was possible and that, to accomplish this, he would have to "match the prosecution's . . . timeline."  (Kolodziej Dep. 32:12-23; Kolodziej ¶ 2.)  Kolodziej was unaware at the time that the Unedited Mason Interview had been edited before it aired on the Dateline Broadcast and that, consequently, the interview that he saw on the program and the accompanying Edited Dateline Transcript that he ordered was an edited version of Mason's actual interview with NBC.  (Kolodziej Dep. 27:3-18.)

After he heard and saw parts of the Dateline Broadcast, Kolodziej studied the Edited Dateline Transcript of Mason's interview and read news articles concerning the Serrano case.  *Id.* 15:1-16:2.  Everything that Kolodziej understood about the details of the flight Mr. Serrano was alleged to have taken from Tampa to the Atlanta Airport he gleaned or deduced primarily from his

study of the Edited Dateline Transcript.  *Id.* 16:14-17, 48:9-12.  Kolodziej believed that the terms of the "challenge" as revealed in the Edited Dateline Transcript were sufficient to allow him to attempt to perform the "challenge."  *Id.* 36:8-14.

For instance, Kolodziej did not know the actual landing time of Mr. Serrano's Delta plane in Atlanta, nor did he consult any Federal Aviation Administration ("FAA") records or other such information that might have indicated at what time Mr. Serrano's plane actually landed or arrived at its gate.  *Id.* 18:4-15, 19:1-20:5; Tr. 7-8.  However, based on the information he studied from the Edited Dateline Transcript, he deduced that "wheels down" had to have been at 9:00 p.m. since the hotel video showed Mr. Serrano at the hotel at around 9:30 p.m.  *Id.*  Similarly, Kolodziej did not know at which gate, concourse or terminal Mr. Serrano's Delta plane arrived at the Atlanta Airport because nothing in the Edited Dateline Transcript revealed such information.  (Kolodziej Dep. 20:6-24, 35:14-19.)  However, Kolodziej thought that it was acceptable for purposes of the "challenge" that his plane arrived at the only terminal that did not require him to take a train in order to exit the terminal.  *Id.* at 35:17-24.  He also did not know in which seat Mr. Serrano sat on the flight or whether Mr. Serrano traveled by coach or in first-class.  *Id.* 22:1-12.  However, because he understood Mr. Serrano to have been a wealthy individual and a regular business flyer, Kolodziej believed that Mr. Serrano would have traveled in first-class on the flight.  *Id.* 22:16-23; Tr. 14.  Therefore, Kolodziej flew in the first-class section of his plane.  Tr. 8.  In actuality, Mr. Serrano's Delta plane could unload passengers from a door between the coach section and the section in front of coach as well as from a door between the cockpit and the first-class section, as could the Delta flight that Kolodziej flew.  *Id.* 25; JFPS ¶ 9J, K.  Kolodziej also did not investigate how many passengers were on Mr. Serrano's flight, nor did he know how Mr. Serrano was alleged to have traveled from the Atlanta Airport back to the La Quinta hotel.  (Kolodziej Dep. 22:24-

23:6, 18-21.)  Although many of the details of Mr. Serrano's flight were not revealed in the Edited Dateline Transcript that he ordered, Kolodziej understood that his acceptance of the "challenge" entailed him replicating the prosecution's theory of the Serrano case "as best as could be done" and "as best as [he] could do" based on the Edited Dateline Transcript.  *Id.* 35:11-24.

With that understanding in mind, on December 10, 2007, ten years after the murders occurred, Kolodziej flew from Tampa to the Atlanta Airport on Delta flight number 618, which landed at 8:59 p.m. and arrived at the gate at 9:06 p.m.   (JFPS ¶ 9N, O;[6] Kolodziej ¶¶ 3, 4.) Kolodziej began recording his performance of the "challenge" with his cellular phone at the point at which he exited the plane at 9:06 p.m., as opposed to when the airplane landed because he was not allowed to turn on any sort of electronics at that time.  (Tr. 11, 23-24; Kolodziej Dep. 32:24-33:4, 34:23-35:4; Kolodziej ¶¶ 5, 6.)  From the plane, he arrived at an Econo Lodge hotel at 9:25 p.m., where the recording ended.   (Tr. 11, 23-24; Kolodziej Dep. 32:24-33:4, 34:23-35:4; Kolodziej ¶¶ 4, 7.)  He believed the Econo Lodge was formerly the La Quinta hotel at which Mr. Serrano stayed.  (Kolodziej Dep. 36:17-40:21.)  Kolodziej's belief was based on news articles that he read, the place where he believed the La Quinta hotel was located, the style of the hotel which he believed was similar to the style of La Quinta hotels at the time of Mr. Serrano's stay there, and conversations with people that he believed were knowledgeable of the area at the time, such as taxi drivers and current employees of the Econo Lodge.  *Id.*  Kolodziej's recording time totaled 19 minutes.  *Id.* 33:5-11; 50:10-51:3.

---

[6] These paragraph citations have been corrected by the Court in this Opinion because there are two references to paragraph 9M on page 6 of the Joint Final Pretrial Statement.  *See* Dkt. 89 at 6.  The second reference to paragraph 9M has been changed to 9N, the reference to paragraph 9N has been changed to 9O, and the reference to paragraph 9O has been changed to 9P.

Kolodziej contends that adding the time between when his plane was "wheels down" and the time that it stopped at the gate as well as the time between when the airplane door opened and the time it took him to get to the airplane door to exit the plane was within the 28 minute time limit for the "challenge." *Id.* 33:5-11, 34:8-35:10, 50:20-51:3.  Therefore, Kolodziej believed that he had successfully performed the "challenge."  Kolodziej Aff. ¶ 5.

Accordingly, on December 15, 2007, Kolodziej sent a letter to Mason at the Mason Law Firm informing Mason that he had successfully performed the "challenge" and requesting what he believed was the promised payment in the amount of one million dollars.  (Kolodziej Dep. 49:11-19; JFPS ¶ 9P.)  On January 2, 2008, Mason responded, also by letter, in which he denied that his comments during the interview constituted a serious challenge.  (Kolodziej Dep. 49:21-23; Dkt. 72, Ex. 1-B, January 2, 2008 Mason Letter to Kolodziej ("Jan. 2008 Mason Letter"); Mason Aff. ¶ 5.)  On the contrary, Mason explained in the letter that the comments he made in the interview were merely intended to be an illustration of "what could and could not be done with respect to Mr. Serrano's alibi, and how serious the reasonable doubt was/is."  (Jan. 2008 Mason Letter.)  On that basis, Mason rejected Kolodziej's demand.  *Id.*  Kolodziej replied to Mason's letter, to which Mason responded with another letter, dated February 11, 2008, stating that he believed he had sufficiently explained in his previous letter to Kolodziej why his demand was being rejected, and that, therefore, he did not wish to have any further communications with Kolodziej.  (Kolodziej Dep. 51:4-7, 12-14, 18-20; Dkt. 79-11, Ex. K, February 11, 2008 Mason Letter to Kolodziej ("Feb. 2008 Mason Letter").)

**B.    Procedural History**

Believing he was entitled to one million dollars, Kolodziej filed a lawsuit against Mason in the United States District Court for the Southern District of Texas alleging breach of a unilateral contract for Mason's refusal to pay Kolodziej. *See Kolodziej v. Mason*, CIV.A. H-09-1889 (S.D.

Tex. filed June 17, 2009); Kolodziej Dep. 51:21-25.  That case was dismissed for lack of personal jurisdiction over the defendants.  *See Kolodziej v. Mason*, CIV.A. H-09-1889, 2009 WL 3460238 (S.D. Tex. Oct. 23, 2009).  It was at that point that Kolodziej became aware of Mason's unedited interview with NBC News, that Dateline had been responsible for editing the interview and for producing the corresponding transcript that Kolodziej had previously ordered, and that neither Mason nor the Mason Law Firm had anything to do with producing the Dateline Broadcast or any edits to the broadcast.  (Kolodziej Dep. 26:19-27:2.)  However, believing that Defendants had ratified NBC's editing of Mason's interview, Kolodziej still decided to file a subsequent lawsuit in a federal district court in Atlanta.  *See Kolodziej v. Mason*, Case No. 1:10-CV-2012-JEC (N.D. Ga. filed June 29, 2010); Kolodziej Dep. 56:15-18; 58:10-59:1, 6-9.  That case was transferred to this Court on May 23, 2011.  *See Kolodziej v. Mason*, Case No. 1:10-CV-2012-JEC, 2011 WL 2009467 (N.D. Ga. May 20, 2011); Dkt. 21.

This matter is before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332 as Kolodziej is a citizen of Texas, Mason is a Florida citizen, and J. Cheney Mason, P.A. is a Florida corporation.  *See* Dkt. 1, Compl.  In the Complaint, Kolodziej alleges that Defendants breached a unilateral contract with him when they refused to pay him one million dollars for completing the "challenge" as presented on the Dateline Broadcast on national television, which he alleges consisted of someone being able to travel from the Atlanta Airport to a La Quinta hotel location in Atlanta within 28 minutes.  *Id.* at 2-3, 7-8.  The instant motion for summary judgment followed. In their Motion, Defendants argue that no unilateral contract was formed between them and Kolodziej.  Specifically, Defendants maintain that the "challenge" did not constitute an offer to contract, but that even if it did, Kolodziej cannot prove that he performed the challenge.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2).  Issues of facts are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A fact is "material" if it may affect the outcome of the suit under governing law. *Id.*  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1164 (11th Cir. 2003).

## III.    DISCUSSION

### A.     Choice of Law

Normally, "[t]he rule of decision in a diversity case is a matter of state law selected under the conflicts of law principles of the state where the district court sits."  *New England Merchants Nat. Bank v. Rosenfield*, 679 F.2d 467, 471-72 (5th Cir. 1982) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)).  However, "[w]here . . . the case is transferred to another district pursuant to 28 U.S.C. s 1404(a) . . ., the transferee court must apply the conflicts principles of the transferor state unless venue in the transferor state was improper."  *New England Merchants*, 679 F.2d at 471-72 (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)).  Since this case was

transferred from the Northern District of Georgia (*see* Dkt. 21) and venue in Georgia was not improper (*see* Dkt. 20 at 14-15), this Court must apply the conflict of law rules of Georgia.

Georgia law provides that:

> Except as provided hereafter in this Code section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this title applies to transactions bearing an appropriate relation to this state.

Ga. Code Ann. § 11-1-105(1). Here, the purported contract at issue "bears a reasonable relation" to both Florida and Georgia. The Unedited Mason Interview took place in Florida, but acceptance of the "contract" would have to be in Georgia as that is where the last leg of the Serrano trip purportedly occurred. The parties have agreed that Florida "shall govern their rights and duties" in this matter. (Tr. 14.) Therefore, this Court applies Florida law to this action.

## B.     Unilateral Contracts

Whereas a bilateral contract is one in which there is an exchange of promises between two parties to the contract, a unilateral contract is an exchange of a promise for an act or forbearance. *Ballou v. Campbell*, 179 So. 2d 228, 229-30 (Fla. 2nd DCA 1965). Mutual assent, or agreement, between the parties is necessary for the formation of any contract. *Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989) ("Mutual assent is an absolute condition precedent to the formation of [a] contract. Absent mutual assent, neither the contract nor any of its provisions come into existence."). However, it is the expression of mutual assent or apparent assent, and not the mental assent itself, that is essential to forming a contract. *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985); *see also Med-Star Cent., Inc. v. Psychiatric Hospitals of Hernando Cnty., Inc.*, 639 So. 2d 636, 637 (Fla. 5th DCA 1994) (holding that the parties' subjective intent is not material

in determining whether a contract was formed).  Thus, "an objective test is used to determine whether a contract is enforceable."  *Robbie*, 469 So. 2d at 1385.  While courts should not completely ignore the actual and proven assent of either of the parties, the law generally imputes to a person an intention corresponding to the reasonable meaning of his words and acts.  *Royal Am. Realty, Inc. v. Bank of Palm Beach & Trust Co.*, 215 So. 2d 336, 338 (Fla. 4th Dist. Ct. App. 1968) ("In the construction of contracts[,] the intention of the parties is to govern.  Such intention is ordinarily deduced from the language employed when the same is without ambiguity."); *see also Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. 4th DCA 2003) ("[A]bsent any evidence that the parties intended to endow a special meaning in the terms used in the agreement, the unambiguous language is to be given a realistic interpretation based on the plain, everyday meaning conveyed by the words.  [A] court must construe a contract in a manner that accords with reason and probability; and avoid an absurd construction.").

Courts determine whether the parties expressed their assent to a contract by analyzing their agreement process in terms of offer and acceptance.  *Jackson v. Inv. Corp. of Palm Beach*, 585 So. 2d 949, 950 (Fla. 4th DCA 1991).  Under an objective test, "the true interpretation of an offer or acceptance is . . . what a reasonable person in the position of the parties would have thought it meant."  *Id.* (internal quotations omitted).

As noted above, an offer in a unilateral contract calls for acceptance by performance or forbearance.  *Southampton Dev. Corp. v. Palmer Realty Group, Inc.*, 769 So. 2d 1113, 1115 (Fla. 2nd DCA 2000).  This case deals with a particular type of offer within the unilateral contract context – a public offer of a reward.  In terms of "offers of a reward, . . . [t]he offer is a mere proposal or conditional promise which, if accepted before it is revoked, creates a binding contract."  *Jackson*, 585 So. 2d at 950; *see also Slattery v. Wells Fargo Armored Serv. Corp.*, 366 So. 2d 157,

158 (Fla. 3rd DCA 1979) ("a reward is contractual in nature, requiring the acceptance of an offer supported by consideration."); *Sumerel v. Pinder*, 83 So. 2d 692, 693 (Fla. 1955) ("Rewards are contractual.").

These cases are often referred to as "prove me wrong" cases as they entail an offer of payment to anyone who can prove the offeror wrong regarding a particular claim.  The most famous of these cases is from the Court of Appeal of England and Wales.  There, the appellate court upheld the trial court's decision that a company advertisement that offered to pay a specified reward "to any person who contracts the increasing epidemic influenza, colds, or any disease caused by taking cold, after having used the [Carbolic Smoke] ball threes time daily for two weeks, according to the printed directions supplied with each ball" was a valid offer.  *Carlill v. Carbolic Smoke Ball Co*., (1983) 1 Q.B. 256 (Court of Appeal).  Examples of other notable cases include: 1) a boast made on national television that the famous outlaw Jesse James had not been killed in 1882, as most people thought, and that $10,000 would be given "to anyone who could prove me wrong." *James v. Turilli*, 473 S.W. 2d 757, 758-59 (Mo. Ct. App. 1971).  On appeal, the court held that a valid contract formed when the plaintiffs demonstrated, at trial, that James had been killed in 1882, *id.* at 761; 2) the Eighth Circuit's affirmation of a district court's decision that a tax protestor's assertion on a television news program that "[i]f anybody calls this show . . . and cites any section of this [tax] Code that says an individual is required to file a tax return, I'll pay them $100,000" was a valid offer.  *Newman v. Schiff*, 778 F.2d 460, 461-63, 466 (8th Cir. 1985); and 3) a statement before a state gambling commission regarding punchboard legitimacy by the vice president of a corporation that distributed punchboards that he would "put a hundred thousand dollars to anyone to find a crooked board." *Barnes v. Treece*, 15 Wash. App. 437, 438 (1976).  He went on to state, "[i]f they find it, I'll pay it." *Id.*  The court found this to be a valid offer for a unilateral contract

even though his statement elicited laughter from the audience that was present during the proceedings. *Id.*

Defendants' argument that no unilateral contract ever formed between them and Kolodziej rests on several grounds. The Court will address each of these grounds in turn.

> 1. *No Unilateral Contract Formed Because Kolodziej Was Unaware of The Unedited Mason Interview at the Time He Attempted to Perform the "Challenge"*

Defendants' first contention for why no unilateral contract was formed between them and Kolodziej is that, at the time Kolodziej attempted to perform the "challenge," he had only seen and heard the Edited Mason Interview and was unaware that there was an unedited version. (Mot. at 8-9; Reply at 4 n. 1; Tr. 5, 12-13; Kolodziej Dep. 25:9-15, 26:14-15, 27:3-18, 32:4-8, 36:4-7.) It is undisputed that Kolodziej learned of the unedited version after October 2009, when his first lawsuit against Defendants in a Texas federal district court was dismissed. (Tr. 12-13; Kolodziej Dep. 51:21-25, 56:15-18; 58:10-59:1, 6-9.) Defendants contend that they cannot be held responsible for the Edited Mason Interview that Kolodziej heard because they had nothing to do with the way NBC edited Mason's actual interview or with the decision to produce that edited version on television, which Kolodziej acknowledged. (Mot. at 9-11; JFPS ¶ 9M; Mason Aff. ¶ 6; Kolodziej Dep. 26:19-27:2.) Accordingly, Defendants argue, Kolodziej performed a "challenge" that cannot be attributed to them. (Mot. at 9-11.)

Kolodziej originally argued that, by remaining silent, Defendants ratified the "challenge" as aired on the Dateline Broadcast because they should have had NBC issue a retraction. (Kolodziej Dep. 61:21-64:3.) However, Kolodziej abandoned this argument when faced with Mason's declaration, attached to the Motion, wherein Mason stated that he was unaware NBC had even edited his interview, that he did not see the broadcast when it aired, and that he had only become aware of this edited version when Kolodziej contacted him to demand payment. (Mason

Aff. ¶ 6; Tr. 4, 17.)  In his Complaint, Kolodziej set forth two grounds for breach of contract:  1) the "challenge" as presented in the broadcast, and 2) the "challenge" as presented in the unedited interview.  *See* Compl. ¶ 16; Tr. 11:02, 5-8; 11:03, 22-24. Kolodziej now maintains that "his claim is limited to Mason's challenge in the raw interview transcript."  (Resp. at 3 n. 19 (citing Compl. ¶ 15).)

However, Kolodziej cannot rely on the "challenge" as presented in the Unedited Mason Interview in order to form a unilateral contract.  "The law is well settled in this state that before a reward is entitled to be collected, the offeree must have knowledge of the existence of the offer of reward."  *Slattery*, 366 So. 2d at 159. *See also Nabry v. MV Transp, Inc.*, 07-CV-0124 PJS/JJG, 2007 WL 4373107, *5 (D. Minn. Dec. 13, 2007) (citing *Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 707 (Minn. 1992) ("[F]or a unilateral contract to be formed the offer must be *communicated to the offeree*.")(emphasis in original); *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 734 (Ala. 1987) ("an offer must be communicated before it may be accepted."); *Netbula, LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007) ("Mutual assent is accomplished when a specific offer is communicated to the offeree, and an acceptance is subsequently communicated to the offeror."); *Foster v. Udall*, 335 F.2d 828, 831-32 (10th Cir. 1964) ("In ordinary usage in the law of contracts the proposal by the offeror is not effective and is not an offer until it is made known to the party who thereby is in the position to accept or to reject the offer.").  In *Zemke v. City of Chicago*, the plaintiff "claim[ed] that the 'Notice of Job Offer' was a written offer, which he accepted."  100 F.3d 511, 513 (7th Cir. 1996).  The court noted that "[a]lthough the notice was signed by the appropriate city officials and was, undeniably, an offer, it was never, for unexplained reasons, communicated to [the plaintiff].  The undated document was simply placed in [the plaintiff's] personnel file.  He did not learn of it until nearly three years after

it was apparently prepared." *Id.* Therefore, the Seventh Circuit concluded that "[i]t follows, then, that [the plaintiff] never accepted the offer—he did not even know it existed." *Id.*

Here, Kolodziej has abandoned his attempts to hold Defendants responsible for the NBC Edited Mason Interview that aired and of which he was aware. Kolodziej cannot now rely on the Unedited Mason Interview as there cannot be any mutual assent where an individual "accepts" an offer of which he was unaware at the time of his "performance." Therefore, as a matter of law, no unilateral contract formed between Defendants and Kolodziej under these circumstances.

>       2.    *No Unilateral Contract Formed Because The "Challenges" In The Edited and Unedited Versions of Mason's Interview Are Not The Same In Substance*

To the extent that Kolodziej is still relying on the "challenge" in Mason's edited interview because of his belief that this version is the same in substance as the "challenge" in the unedited version, this contention also fails as a matter of law. (Resp. at 3 n. 19; Tr. 15; Kolodziej Dep. 32:4-8; Compl. ¶ 16 ("even if Mason's version is the unedited statement, it contains in substance the same challenge as broadcast on Dateline. Mason's version still contains what a reasonable viewer would interpret is a promise to pay one million dollars if the last leg of the trip was made within 28 minutes.").) Defendants argue that the Edited Mason Interview is a misrepresentation of what Mason actually said in his unedited interview. (Mot. at 9-11.) The Court agrees.

Kolodziej argues that the "challenge" as presented in both Mason's edited and unedited interview versions do not have to contain the exact same words to be the same "offer" in substance, but that the terms of the challenge in both the broadcast and the unbroadcast versions were, in essence, that Mason would pay one million dollars to anyone who made a trip from an airplane landing at the Atlanta Airport to the location of Mr. Serrano's hotel in 28 minutes. (Resp. at 16; Tr. 22-23, 28, 34.) Kolodziej contends that is what distinguishes this case from a situation where

the individual has performed an act without knowing anything about the offer and then subsequently argues that he accepted the offer by his actions. (Tr. 31-32.)

Here, no rational juror could find that a reasonable person could conclude that the "challenge" in the edited and unedited versions of the Mason interview are in substance the same, regardless of whether either version of the "challenge" can be said to constitute an offer. First, it is clear that, in the Edited Mason Interview, when Mason's "challenge" is edited to "I challenge anybody to show me—I'll pay them a million dollars if they can do it," the words "them" and "they" refer to the word "anybody." Thus, in that version, the "promise" to pay a million dollars to perform the "challenge" is clearly directed towards anyone and, therefore, is open to anyone. By adding Mason's omitted words back in between "show me" and "I'll pay them" in the actual Unedited Mason Interview, the "challenge" becomes:

> I challenge anybody to show me, and guess what? Did they bring in any evidence to say that somebody made that route, did so? State's burden of proof. If they can do it, I'll challenge 'em. I'll pay them a million dollars if they can do it.

No reasonable person could hear and view the totality of that excerpt and conclude that the words "them" and "they" in the last sentence refer to the word "anybody" in the first sentence, as Kolodziej argues. *See* Resp. at 8 (Kolodziej argues that, under the objective test standard, a rational juror could find that a reasonable person who heard the "challenge" could have concluded that Mason's "offer" was addressed to the general public, instead of just to the prosecutors).

Kolodziej further argues that whether Mason's communication was made to the prosecution or to the general public is a contract term that can be seen as an ambiguous fact issue. (Tr. 20.) The Court disagrees. "Whether an ambiguity exists in a contract . . . is a question of law." *Smith v. Shelton*, 970 So. 2d 450, 451 (Fla. 4th DCA 2007). "Where the wording of an

agreement is ambiguous, its interpretation involves questions of fact, precluding summary disposition. Whether a document is ambiguous depends upon whether it is reasonably susceptible to more than one interpretation. However, a true ambiguity does not exist merely because a document can possibly be interpreted in more than one manner." *Id.* Here, the Unedited Mason Interview is not reasonably susceptible to more than one interpretation. Therefore, no ambiguity exists. Read, seen and heard in context, the above-noted excerpt from Mason's unedited interview can only lead a reasonable person to but one understanding, that the words "them" and "they" as used throughout the entire excerpt now refers to the state prosecution. *See Leonard v. Pepsico*, 88 F. Supp. 2d 116, 128 (S.D.N.Y. 1999), *aff'd* 210 F.3d 988 (2d Cir. 2000) ("[w]hether there was an offer to enter into a contract requires the Court to determine how a reasonable, objective person would have understood the defendant's communication, an inquiry that is commonly performed by courts on a motion for summary judgment.").

The inclusion of Mason's omitted words does not create a parenthetical thought, as Kolodziej argues. *See* Resp. at 9; Tr. 32-33. On the contrary, whereas Mason starts off by challenging "anybody" to show him something, he then goes on to say, "and guess what?." He is now transitioning into a whole new thought, as becomes evident as the remainder of the section is read and heard. Mason says: "and guess what? Did they bring in any evidence to say that somebody made that route, did so?" The word "they" in this context clearly cannot refer to "anybody" because "anybody" cannot bring in evidence. The next sentence, "State's burden of proof," confirms that "they" refers to the state prosecution, which makes sense because state prosecutors can bring in evidence.

Viewing this excerpt in the context of the entire interview further supports the Court's conclusion. Mason's entire interview with NBC concerns the Serrano trial. The Court's

conclusion that "they" refers to the state prosecutors from the Serrano trial can be gleaned from the context of the entire Unedited Mason Interview.  Thus, within that broader context, the "State's burden of proof" specifically refers to the state prosecutors in the Serrano trial.

After asking whether the state prosecutors had brought in evidence that anybody could make the last leg of the Serrano trip as he had, Mason goes on to say: "If they can do it, I'll challenge 'em.  I'll pay them a million dollars if they can do it."  Again, as read and heard in the interview, these last sentences naturally flow from the previous sentences as a continuation of the same thought – that Mason believed the state prosecutors could not prove their theory that Mr. Serrano traveled from his plane's landing time at Atlanta Airport to his La Quinta hotel in 28 minutes.  Mason was challenging "them" – the state prosecutors – to prove their theory.  This is the same theme that he had spoken about just prior to his discussion concerning the last leg of the Serrano trip with regard to the amount of time it purportedly took Mr. Serrano to travel from the Orlando Airport to the crime scene in Bartow and commit all of the murders within one hour and thirty minutes.  Mason talked about how he believed this timeline was "highly improbable." Furthermore, Mason's comments regarding the Bartow timeline were said within the context of Mason's overarching argument, which was that it was impossible for anyone to have committed the murders between the time Mr. Serrano was first seen on the La Quinta hotel video camera in the morning of the day of the murders and the time that he was again seen on that camera in the evening.  That was his main argument regarding the prosecution's theory during the entire interview.

"It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made."  *Trefsgar v. Contributors to Pennsylvania Hospital*, CIV.A. 97-488, 1997 WL 214803 (E.D. Pa. Apr. 23, 1997); *see also Nooruddin v. Comerica Inc.*, 11-1188-EFM, 2012

WL 1154497, *3 (D. Kan. Apr. 5, 2012) (A communicated offer creates a power to accept *only the offer that is made*.).  Kolodziej heard one "challenge" that was open to anybody, which therefore included him.  However, the actual "challenge" was not open to anybody, and that conclusively forecloses any opportunity Kolodziej has to now argue that the "challenge" somehow constituted a valid offer and that he accepted that offer by his performance.  Kolodziej cannot proceed with his claim for one million dollars by supposing, believing, imagining or hoping that an offer was made to him that simply was not.

Kolodziej argued that attorney Bob Norgard's joke that "All the cameras guys were leaving to go to Hartsfield to try to get to the . . .," eliciting laughter, and Mason's response, "Call me when you're ready for your check," indicates that those present during the live interview believed that the "challenge" was open to anyone, which Kolodziej claims supports his contention that that is what a reasonable person would have understood.  (Resp. at 9-10, 12.)  First, it is unclear whether the cameramen were actually attempting to leave to complete the "challenge," albeit in jest, or whether Mr. Norgard just made up that scenario on his own in order to make a joke.  Nevertheless, in other situations where an "offer" has elicited laughter or where there was some other indicia of jest or pure puffery, courts have found that a reasonable reaction from the individual who heard and saw this apparent jest would be to seek some sort of validation that the communication was a serious offer.  For instance, the plaintiff in *Barnes* had seen the vice president's statement on television that "I'll put a hundred thousand dollars to anyone to find a crooked board.  If they find it, I'll pay it," a statement that elicited laughter from the audience members who were present at the proceedings.  15 Wash. App. at 438.  Under these circumstances, the court found that the plaintiff had acted as a reasonably prudent person would when he contacted the defendant to ensure that the offer was serious, which gave

the defendant the opportunity to confirm that the offer was, in fact, serious and that the offered payment was safely being held in escrow. *Id.* at 442, 439. Essentially, courts have viewed such indicia of jest or hyperbole as providing a reason for an individual to doubt that an "offer" was serious. Thus, once Kolodziej, as a reasonable person, viewed the Unedited Mason Interview and became aware of this Bob Norgard "joke," that should have given him some reason to doubt that the "offer" was serious. Such indicia would have given any reasonable person pause, considering all of the attendant circumstances in this case.

The Court finds that no reasonable person could conclude that the substance of Mason's "challenge" in the edited and unedited versions of his NBC interview are the same. Thus, Kolodziej's argument here fails as a matter of law.

3.     *Defendants' Remaining Arguments As To Why No Unilateral Contract Was Formed*

The Court has determined that no unilateral contract was formed between Defendants and Kolodziej because Kolodziej was unaware of the "challenge" in the Unedited Mason Interview at the time he attempted to perform it and because the Edited Mason Interview that he did hear was not the same in substance as the unedited version he did not hear. Therefore, the Court need not address Defendants' remaining arguments – that Mason's communication did not constitute an offer and that, in any event, Kolodziej did not adequately perform the "challenge."

## IV.     CONCLUSION

Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). For the aforementioned reasons, the Court will grant Defendants' Motion for Summary Judgment. No

genuine issues of material fact exist for determination by a jury and Defendants are entitled to judgment in their favor as a matter of law.

Accordingly, it is hereby **ORDERED AND ADJUDGED:**

1.  Defendants James Cheney Mason and J. Cheney Mason, P.A.'s Motion for Summary Judgment (Dkt. 72) is **GRANTED**.

2.  The Clerk is directed to terminate all pending motions, enter judgment in favor of Defendants, and close this case.

**DONE** and **ORDERED** in Orlando, Florida on January 29, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties